

**SIGNED this 19 day of December, 2019.**

_James P. Smith_

**James P. Smith**
**Chief United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of | : | Chapter 11 |
| | : | Case No. 18-30913-JPS |
| CHRISTOPHER DAVID POLK, | : | |
|     Debtor | : | |
| | : | |
| KAPITUS SERVICING, INC., formerly | : | |
| known as Colonial Funding Network, Inc. as | : | |
| servicing provider for Strategic Nationwide | : | |
| Funding, | : | |
|     Plaintiff | : | Adversary Proceeding |
| | : | No. 19-03007 |
| vs. | : | |
| | : | |
| CHRISTOPHER DAVID POLK, | : | |
|     Defendant | : | |

BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

For Debtor/Plaintiff: Justan C. Bounds
Carlton Fields, P.A.
1201 W. Peachtree Street
Suite 3000
Atlanta, GA 30309

Donald R. Kirk
Carlton Fields Jorden Burt, P.A.
P. O. Box 3239
Tampa, FL 33601

J. Ryan Yant
Carlton Fields Jorden Burt, P.A.
P. O. Box 3239
Tampa, FL 33601

For Defendants: Wesley J. Boyer
Boyer Terry LLC
348 Cotton Avenue
Suite 200
Macon, GA 31201

**MEMORANDUM OPINION**

In this adversary proceeding, Kapitus Servicing, Inc., formerly known as Colonial

Funding Network, Inc. as servicing provider for Strategic Nationwide Funding ("Kapitus") seeks

to have its claim against Debtor declared nondischargeable pursuant to 11 U.S.C.

§§ 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6).  The matter came on for trial on September 17,

2019.[1]

At the conclusion of the evidence, the Court requested that the parties submit their

closing arguments in the form of proposed findings of fact and conclusions of law.  The Court,

having considered the evidence, the parties' arguments and the law, hereby issues its findings of

facts and conclusions of law pursuant to Bankruptcy Rule 7052.

**FINDINGS OF FACTS**

Debtor was the owner and managing member of AgForest, LLC ("AgForest"), an entity in

the timber business.  On June 14, 2016, AgForest entered into a "Revenue Based Factoring

(RBF/ACH) Agreement" (the "June Contract") with Strategic Nationwide Funding ("Strategic")

pursuant to which Strategic purchased $55,200 of AgForest's future receivables for the purchase

price of $40,000.[2]  Pursuant to the June Contract, AgForest was required to repay Strategic

$55,200 over a period of months by payments of $219 per business day.  Debtor personally

---

[1] A transcript of the trial (hereinafter referred to as "Tr.") is found at Docket No. 23
and supplemented by Docket No. 28.

[2] AgForest had a long-standing relationship with Strategic.  The evidence established
that the parties had previously entered into between three and five similar financing contracts.

3

guaranteed the June Contract.

AgForest was required to maintain a bank account into which all of its receivables were deposited. Kapitus was responsible for servicing the June Contract for Strategic. AgForest was required to sign an agreement allowing Kapitus to make electronic drafts on AgForest's bank account ("ACH Debit") to collect the daily payments of $219.

The agreement was funded on June 16, 2016 when the agreed amount was deposited by Strategic into AgForest's bank account.[3] Payments on the June Contract began June 17, 2016 and were timely withdrawn by Kapitus through October 7, 2016.

On September 13, 2016, AgForest entered into another agreement with Strategic pursuant to which Strategic purchased an additional $55,200 of AgForest's future receivables for $40,000 (the "September Contract"). Debtor also personally guaranteed the September Contract. The September Contract required payments of $239 per business day until the total of $55,200 had been paid to Strategic. Except for the payment terms, the terms of the June and September Contracts and guarantees were the same.[4]

The September Contract was funded on September 20, 2016 when Strategic deposited $39,195 into AgForest's bank account.[5] The daily payments of $239 began on September 21 and

---

[3] $22,709.09 was actually deposited. The balance of the $40,000 provided for by the June Contract ($17,290.91) was applied to pay off the outstanding balance of a prior contract between the parties.

[4] For reasons unimportant to this decision, the personal guarantees were not absolute. However, under the facts of this case, Debtor does not dispute his personal liability on the two contracts.

[5] The $39,195 represented the agreed $40,000 advance less $805 in fees charged by Strategic pursuant to the contract.

were timely withdrawn by Kapitus through October 7, 2016.

Debtor testified that, prior to October 2016, AgForest had been working on a major timber contract for 30 to 45 days.  However, sometime prior to October, the land owner changed his mind and did not enter into the contract.[6]  Debtor testified that this devastated the company.  He testified AgForest could no longer make the daily payments to Strategic.  Accordingly, on or about October 11, 2016, Debtor placed a "stop payment" order on the ACH Debits to Strategic.

Debtor filed a voluntary Chapter 13 case in this Court (Case No. 16-31255) on November 22, 2016.  This case was dismissed on March 22, 2017.  Debtor filed a second Chapter 13 case in this Court on May 17, 2017 (Case No. 17-30577).  This case was dismissed on May 29, 2018.  Debtor filed the instant Chapter 11 case in this Court on August 30, 2018.  Kapitus filed a claim, arising from the June and September Contracts, of $122,847.49.  The complaint initiating this adversary proceedings was timely filed on March 18, 2019.[7]

## CONCLUSIONS OF LAW

Kapitus asserts that its claim against Debtor is nondischargeable under several subsections of 11 U.S.C. § 523(a).  Kapitus has the burden of proving by a preponderance of the evidence that its claim is nondischargeable.  Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 564, 112 L.Ed. 2d 755 (1991).

---

[6]  Debtor's testimony was that the contract failed sometime between August and October 2016.  However, neither party tried to determine the exact date that the contract failed.

[7]  By two consent orders (Docket No. 51 and Docket No. 65), the deadline for Kapitus to file a dischargeability complaint was extended from December 17, 2018 to March 18, 2019.

> [C]ourts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,' and recognize that '[t]he reasons for denying a discharge...must be real and substantial, not merely technical and conjectural.'" In re Tully, 818 F.2d 106, 110 (1st Cir. 1987) (quoting Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir. 1934)) see also, Boyle v. Abilene Lumber, Inc.(Matter of Boyle), 819 F.2d 583, 588 (5th Cir. 1987). This narrow construction ensures that the "honest but unfortunate debtor" is afforded a fresh start. Birmingham Trust Nat'l Bank v. Case, 755 F.2d 1474, 1477 (11th Cir. 1985).

Equitable Bank v. Miller, (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994). The Court will address each of Kapitus' arguments.

1. Section 523(a)(2)(B).

Kapitus argues that Debtor made a number of false representations in the contracts and thus its claim is nondischargeable under section 523(a)(2)(B). Section 523(a)(2)(B) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-...
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-...
>>> (B) use of a statement in writing-
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with intent to deceive...

(A) Insolvency.

Kapitus argues that Debtor made a false representation in Paragraph 2.9 of each contract

6

that AgForest, an insider of Debtor (11 U.S.C. § 101(31)(A)(iii)), was not insolvent.  That

paragraph provides, in pertinent part:

> No Bankruptcy or Insolvency.  As of the date of this Agreement,
> [AgForest] represents that it is not insolvent and does not
> contemplate and has not filed any petition for bankruptcy
> protection under Title 11 of the United States Code and there has
> been no voluntary petition brought or pending against [AgForest].
> [AgForest] further warrants that it does not anticipate filing any
> such bankruptcy petition and it does not anticipate that an
> involuntary petition will be filed against it....

Kapitus argues that this representation was materially false because AgForest was insolvent.  To

prove insolvency of AgForest, Kapitus points to AgForest's inability to cover a $64,325.14

"missing" check owed to one of AgForest's customers, a $140,062.87 judgment owed to a

creditor, a $34,000.00 tax lien and a debt to the IRS of approximately $1,000,000.00.  However,

Kapitus' argument fails for several reasons.

Initially, it should be noted that the term "insolvent", as used in Paragraph 2.9 of the

contracts, is not defined.  The contracts, pursuant to Paragraph 4.5, are to be governed by New

York law.  Under New York law, words used in a contract are to be given their plain meaning.

O'Neill v. O'Neill, 174 A.D. 3d 1526, 1527, 108 N.Y. S. 3d 255, 257 (2019).

Kapitus points to the nonpayment of certain debts and essentially argues that AgForest

was insolvent because it was "generally not paying its debts as they come due".  One New York

court has recognized the difficulty of determining whether a debtor is generally paying its debts

as they come due by examining how bankruptcy courts have handled the issue in involuntary

bankruptcy cases.  In Magten Asset Mgt. Corp. v. Bank of N.Y., 15 Misc. 3d 1132[A], 2007 N.Y.

Slip Op. 50951[U], *4-6, 2007 WL 1326795 (Sup. Ct., N.Y. County May 8, 2007) (Fried, J.), the

7

court explained:

> Bankruptcy courts have found that there is no precise definition of
> the term "generally not paying" (Matter of LeSher Intl., Ltd., 32
> BR 1, 2 [Bankr SD N.Y. 1982]; see also In re Brooklyn Resource
> Recovery, 216 BR 470, 481-482 [Bankr ED N.Y. 1997]; In re
> Einhorn Vacation Planning Ctr., 59 BR 179, 185 [Bankr ED N.Y.
> 1986]).  Furthermore, in order to determine whether the debtor is
> not paying its debts as they come due, the court examines the
> number and amount of claims against the debtor, the materiality of
> any nonpayments in the context of the debtor's overall financial
> picture, and its conduct of its financial affairs (In re Brooklyn
> Resource Recovery, 216 BR at 481; see also In re B.D. Intl.
> Discount Corp., 701 F. 2d 1071, 1075 [2nd Cir 1983]; In re
> Amanat, 321 BR 30, 39 [Bankr SD N.Y. 2005], citing In re Paper I
> Partners L.P. 283 BR 661, 677 [Bankr SD N.Y. 2002]; In re
> Century/ML Cable Venture, 294 BR 9, 31 [Bankr SD N.Y. 2003]).

Id. at *7.[8]  Evidence of the overall status of Debtor's claims and payments at the time the

contracts were signed was not developed.  Accordingly, the Court does not have sufficient

evidence to make a determination of insolvency based on the "generally not paying" standard.

Under the Bankruptcy Code, the term "insolvent" means "...financial conditions such that

the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...".

11 U.S.C. § 101(32).  For purposes of New York's fraudulent conveyance statutes:

> A person is insolvent when the present fair salable value of his
> assets is less than the amount that will be required to pay his
> probable liabilities on his existing debts as they become absolute
> and matured.

New York Debtor and Creditor Law § 271[1] (2018).  As is the case with respect to the

---

[8]  The court recognizes that the citations contained in the quote do not conform to The
Blue Book.  However, a note on the decision states "This opinion is uncorrected and will not
be published in the printed Official Reports."  Accordingly, the citations are quoted as
contained in the uncorrected opinion.

"generally not paying" standard, there is insufficient evidence in the record to determine insolvency using the "balance sheet" standard.

At the trial, David Wolfson, the Vice President of Kapitus' Risk Management and Asset Recovery Department, testified as to Kapitus' normal process of investigating and evaluating potential customers. While he testified that he had reviewed hundreds of pages in the AgForest files, he was not personally involved in the investigation which led to the approval of the two contracts in question and none of the documents or materials which he reviewed were introduced into evidence.

Other than the four debts mentioned above, the Kapitus claim and lines of credit from another lender (hereinafter "Kabbage"), no evidence was introduced regarding AgForest's other (if any) liabilities. Further, except for several months of checking account bank statements, no evidence was introduced regarding AgForest's assets. Without evidence of all of AgForest's assets and all of its liabilities as they existed on the date each contract was signed, it is impossible to determine whether or not AgForest was "balance sheet" insolvent on the day each solvency representation was made.

Kapitus argues that when Debtor filed an earlier bankruptcy case in late November 2016, he failed to list AgForest as an asset, thus indicating that it had no value. However, Debtor has filed three bankruptcy cases beginning in November 2016. He testified that there were numerous errors in his schedules caused by mis-communications with his attorneys. Further, even if AgForest had no value at the end of November, that alone would not establish its value in mid-June and September 2016, when the contracts containing the solvency representations were signed. Debtor testified that AgForest lost a major contract sometime in August, September or

October and that this had a devastating impact on AgForest. (Tr. 153-54). However, because the

exact date that this contract was lost was not established, it is impossible to determine whether it

occurred before or after the September Contract was signed.

In summary, the evidence is insufficient to establish that AgForest was insolvent when

each contract was signed. Accordingly, Kapitus has failed to carry its burden of proof on this

issue.

In addition, to prevail on a section 523(a)(2)(B) claim, the plaintiff must prove that it

"reasonably relied" on the false representation. § 523(a)(2)(B)(iii). "Reasonable reliance

connotes the use of the standard of ordinary and average person". City Bank & Trust Co. v.

Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995).

> A determination of reasonable reliance is made on a case by case
> basis by weighing many different factors in the balancing of two
> competing principles. The first principle is that the courts should
> not second guess the decisions of creditors in making loans or
> setting loan policy. The second is that the requirement of
> reasonable reliance should not be used by creditors as a shield in
> allowing them to ignore facts readily available to them. The
> factors weighed in this balancing, among others, are whether the
> creditor followed its established lending procedure in approving
> the loan, whether the creditor used outside sources to verify the
> financial information provided by the debtor, whether the creditor
> had a previous relationship with the debtor, and whether the
> writing contained any "red flags" that should have alerted the
> creditor of potential inaccuracies in the financial information
> provided.

Agribank, FCB v. Gordon (In re Gordon), 277 B.R. 805, 810 (Bankr. M.D. Ga. 2001) (internal

citations omitted).

Here, Kapitus' witness was not involved in the investigation leading to these two

transactions. Although he testified about Kapitus' normal procedures for investigating and

approving these types of transactions, he admitted that he had no personal knowledge as to what actual financial information was provided. (Tr. 101). Further, although he testified that he saw an insolvency analysis of AgForest in the file, he did not review it. (Tr. 150).

Thus, the evidence does not establish what analysis was actually done by Kapitus. Further, it is unknown whether those doing the investigation of AgForest relied on their own analysis of AgForest's solvency or whether they relied on the contractual representations regarding solvency. Finally, without knowing exactly what information was provided to Kapitus, it is impossible to know whether the information contained "red flags" that would have made it unreasonable for the investigators to rely on the contractual representations without further investigation.

Kapitus also has the burden of showing that Debtor acted "with intent to deceive". § 523(a)(2)(B)(iv).

> The issue of whether a debtor acted with the intent to deceive is a question of fact. Bankruptcy courts look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with the intent to deceive. Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent to deceive. Finding of a reckless disregard should be narrowly interpreted. The statutory exception to the discharge of debts for money obtained by a materially false financial statement is meant to apply to those debtors who act with dishonest intent and not to those who are merely careless or presumptuous.

Hurston v. Anzo (In re Anzo), 547 B.R. 454, 470 (Bankr. N.D.Ga. 2016) (internal quotation marks and citations omitted).

The debtor must be guilty of positive fraud, or fraud in fact,

11

> involving moral turpitude or intentional wrong, and not implied
> fraud, or fraud in law which may exist without the imputation of
> bad faith or immorality.

Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir. 1986) (abrogated on other

grounds by Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991).

Debtor testified that when he filed bankruptcy in November 2016, he thought he only

owed the IRS $40,000.  (Tr. 51).  He did not know that the IRS had a claim of approximately

$1,000,000.  (Tr. 44).  He also testified that, until the large timber contract was lost sometime

between August and October, AgForest was in good shape and sales were greater in 2016 than in

2015. (Tr. 31).  Thus, there is no evidence that Debtor believed AgForest was insolvent when he

signed the contracts.  Accordingly, Kapitus has failed to prove that Debtor acted with intent to

deceive.

In summary, Kapitus failed to prove the insolvency of AgForest.  It also failed to prove

that it actually and reasonably relied on the contractual solvency representations.  Finally, it

failed to prove that Debtor intentionally made a misrepresentation regarding solvency.

Accordingly, Kapitus has failed to carry its burden of proving that Debtor made a false

representation with respect to AgForest's solvency.

(B)  Failure to Disclose Debts.

Kapitus next argues that Debtor made a false representation with respect to Paragraph 2.1

of the contracts.  That paragraph states, in pertinent part:

> [AgForest's] bank and financial statements, copies of which have
> been furnished to [Kapitus], and further statements which will be
> furnished hereafter at the discretion of [Kapitus], fairly represent
> the financial condition of [AgForest] at such dates, and since those
> dates there has been no material ~~adverse~~ changes, financial or

12

otherwise, in such condition, operation or ownership [of
AgForest].[9]

Kapitus argues that this representation was false because the bank statements Debtor provided

did not disclose the above referenced judgement, tax lien, large IRS tax debt and the "missing"

check obligation.  However, Debtor testified that the only thing he provided, or was asked to

provide, to Kapitus were checking account bank statements and applications for the transactions.

(Tr. 160).[10]

Under New York law, "contract language is to be read in light of common speech and

interpreted 'according to the reasonable expectations and purposes of ordinary business [ ] people

when making ordinary business contracts'". Heartland Brewery, Inc. v. Nova Cas. Co., 149 A.D.

3d 522, 523, 52 N.Y. S. 3d 55 (1st Dept. 2017) (quoting DMP Contr. Corp. v. Essex Ins. Co., 76

A.D. 3d 844, 845, 907 N.Y.S. 2d 487 (1st Dept. 2010).  Further, "a contract should not be

interpreted to produce a result that is absurd, commercially unreasonable or contrary to the

reasonable expectations of the parties."  Greenwich Capital Fin. Prods., Inc. v. Negrin, 74 A.D.

3d 413, 415, 903 N.Y.S. 2d 346 (1st Dept. 2010) (internal quotation marks omitted).

While financial statements contain information on liabilities and assets, checking account

bank statements do not.  They merely show debits and credits to a particular bank account.  Thus,

to avoid an absurd result, this Court will not interpret Paragraph 2.1 of the contracts to require

AgForest checking account bank statements to contain information about its liabilities when such

---

[9]  There was no testimony as to why the word "adverse" is struck through in this
paragraph.

[10]  There is no contention that Debtor provided false financial statements and, in fact,
Debtor testified that he was never asked for profit and loss statements. (Tr. 160).  Nor was
there any testimony that the applications contained false or incomplete information.

13

information is never included in bank statements in the normal course of business affairs.

Rather, the Court will interpret the paragraph to simply mean that the checking account bank

statements provided were accurate with respect to the debits and credits reflected thereon.  Since

there was no contention that this information was false, the Court rejects Kapitus' argument that

the representation regarding the checking account bank statements was false because the

statements did not reflect certain debts owed by AgForest.[11]

 (C) Future Loans.

 Finally, Kapitus argues that Debtor made a false representation with respect to future

loans in Paragraph 2.10.  That paragraph provides:

> [AgForest] shall not enter into any arrangement, agreement or
> commitment for any additional financing, whether in the form of a
> purchase of receivables or a loan to the business with any party
> other than [Kapitus] without their written permission.

Kapitus argues that this representation was false because AgForest entered into several lines of

credit transactions with another lender named Kabbage after each contract was signed.  However,

this argument fails for two reasons.

 First, as the First Circuit Court of Appeals explained:

> [T]he concept of misrepresentation includes a false representation
> as to one's intention, such as a promise to act.  'A representation of
> the maker's own intention to do...a particular thing is fraudulent if
> he does not have the intention' at the time he makes the
> representation.  Restatement (Second) of Torts § 530(1); see
> Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280,
> 1285 (9th Cir. 1996).  'The state of a  man's mind is as much a fact
> as the state of his digestion.'  Restatement (Second) of Torts § 530
> cmt. a. Likewise, 'a promise made without the intent to perform it

---

 [11]  Furthermore, Debtor does not have an affirmative duty to disclose debts when the
creditor does not request such information.  In re Hunter, 780 F.2d at 1580.

is held to be a sufficient basis for an action of deceit.' W. Page
Keeton, et al., <u>Prosser and Keeton on the Law of Torts</u> § 109, at
763 (5th ed. 1984) (footnotes omitted); <u>see</u> Restatement (Second)
of Torts § 530(1) cmt. c. On the other hand, if, at the time he makes
a promise, the maker honestly intends to keep it but later changes
his mind or fails or refuses to carry his expressed intention into
effect, there has been no misrepresentation. Restatement (Second)
of Torts at § 530 cmts. b, d. This is true 'even if there is no excuse
for the subsequent breach. A debtor's statement of future intention
is not necessarily a misrepresentation if intervening events cause
the debtor's future actions to deviate from previously expressed
intentions.' <u>4 Collier on Bankruptcy</u> ¶ 523.08[1][d], at 523-43.

The test may be stated as follows. If, at the time he made his
promise, the debtor did not *intend to perform*, then he made a false
representation (false as to his intent) and the debt that arose as a
result thereof is not dischargeable (if the other elements of §
523(a)(2)(A) are met). If he did so intend at the time he made his
promise, but subsequently decided that he could not or would not
so perform, then his initial representation was not false when made.
<u>See</u>, <u>e.g.</u>, <u>In re Anastas</u>, 94 F.3d at 1285; <u>Milwaukee Auction
Galleries Ltd. v. Chalk</u>, 13 F.3d 1107, 1109 (7th Cir. 1994) (more
than mere nonperformance of a contract was necessary to establish
misrepresentation); <u>Mellon Bank Corp. v. First Union Real Estate</u>,
951 F.2d 1399, 1410-11 (3rd Cir. 1991) (same); <u>Craft v.
Metromedia</u>, 766 F.2d 1205, 1219, 1221 (8th Cir. 1985).

<u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786-87 (1st Cir. 1997). Thus, it was Kapitus' burden to

prove that, when Debtor signed the two contracts in question, he knew that AgForest would

obtain additional loans from Kabbage and thus did not intend to honor the future financing

representation. However, while the evidence is clear that AgForest did enter into several lines of

credit transactions with Kabbage after each contract was signed, there was no evidence that

Debtor, at the time of signing the contracts, knew that AgForest would enter into those contracts.

Further, as previously explained, it was Kapitus' burden to prove that the alleged

misrepresentations were made by Debtor with the intent to deceive. Debtor testified that Kapitus

was aware of AgForest's relationship with Kabbage because he had discussed the relationship

15

with the investigators, and payments to Kabbage were clearly shown on the checking account

bank statements provided.  He testified that the investigators told him that they did not care about

a line of credit.  (Tr. 74).  Accordingly, the evidence suggests that Debtor did not consider the

Kabbage lines of credit as the type of future funding referenced in Paragraph 2.10 of the

contracts.  Accordingly, Kapitus failed to establish that Debtor acted with intent to deceive.

    (D) Business Purpose.

    Section 2.12 of the contracts provides:

> [AgForest] is a valid business in good standing under the laws of
> the jurisdictions in which it is organized and/or operates, and
> [AgForest] is entering into this Agreement for business purposes
> and not as a consumer for personal, family or household purposes.

Kapitus contends that this representation was false because Debtor used some of the money from

the transactions for his and his girlfriend's personal expenses.[12]  This argument fails for several

reasons.

    First, although the evidence is clear that Debtor paid some of his and his girlfriend's

personal expenses from the checking account into which the Kapitus transaction funds were

deposited, the evidence also showed that some of the payments were in lieu of salary.  Thus, the

fact that some of the expenses paid from this account might be personal does not change the

overall business purpose of the transactions.

    Further, there is no evidence that, when the two contracts were signed, Debtor knew that,

---

[12]  Although this argument was made by Kapitus in its Proposed Finding of Fact and
Conclusions of Law in the section dealing with § 523(a)(2)(A) and a telephone call that
occurred prior to the funding of the September Contract, a close review of the call (Docket No.
28, Exhibit.35) shows that no representation regarding the purpose of the transaction was
solicited or made during the call.  Accordingly, the Court will address this argument as it
relates to the written representation in Paragraph 2.12 of the contracts.

in the future, he would pay personal expenses from the account.  Thus, Kapitus failed to prove an

intent to deceive.

Finally, the subject bank account contained funds from numerous sources, including

Kapitus, Kabbage and timber contracts.  The bank account had a beginning balance in June 2016

of $96,226.36.  (Exhibit 20).  Thereafter, and until the end of September, total deposits (of which

only $61,904.09 came from Kapitus) were $135,855.77.  Over the same period of time,

withdrawals totaled $232,066.01.

"[M]oney is quintessentially fungible property."  People v. Jennings, 504 N.E. 2d 1079,

1089, 512 N.Y.S. 2d 652, 662 (1986).  Accordingly, once the funds from the Kapitus transactions

were deposited into the account, those funds became co-mingled with funds from other sources.

Thus, it is impossible to determine that the specific funds used to pay personal expenses were

directly traceable to funds provided by Kapitus.

2.  Section 523(a)(2)(A).

Kapitus argues that its claim is nondischargeable under 11 U.S.C. § 523(a)(2)(A) because

Debtor made false representations in phone calls with Kapitus prior to the funding of the two

transactions.[13]  Under 11 U.S.C. § 523(a)(2)(A), there is an exception to discharge of a debt:

> ...for money, property, services, or any extension, renewal, or
> refinancing of credit, to the extent obtained by-
>> (A) false pretenses, false representation, or actual
>> fraud, other than a statement respecting the debtor's
>> or an insider's financial condition.

Kapitus contends that in the phone calls, Debtor made false representations regarding additional

---

[13]  A recording of the telephone call prior to the funding of the September contract is
contained in Exhibit 35, which was admitted into evidence as part of the record of this case by
Order Supplementing Evidentiary Record (Docket No. 28).

financing, changes to the financial condition of AgForest, whether AgForest was current on its

taxes, whether Debtor expected any tax liens to be filed, whether Debtor anticipated closing the

business, whether any future bankruptcy filings were planned and whether there were any

outstanding balances to other working cash providers.  Kapitus contends that all of these

representations were false.

Section 523(a)(2)(B) requires that representations "respecting the debtor's financial

condition" be in writing.  In <u>Lamar, Archer & Cofrin, LLP v. Appling</u>, __U.S. __, 138 S.Ct. 1752

(2018), the Supreme Court interpreted the phrase "respecting the debtor's financial condition"

expansively.  The Court held:

> We also agree that a statement is "respecting" a debtor's financial
> condition if it has a direct relation to or impact on the debtor's
> overall financial status.  A single asset has a direct relationship to
> and impact on aggregate financial condition, so a statement about a
> single asset bears on a debtor's overall financial condition and can
> help indicate whether a debtor is solvent or insolvent, able to repay
> a given debt or not.  Naturally, then a statement about a single asset
> can be a "statement respecting the debtor's financial condition."

<u>Id.</u> at 1761.  If a representation about one asset must be in writing, then logically, representations

regarding a debt or several debts must also be in writing.  Accordingly, any oral representations

by Debtor on the phone calls about debts of the company or his personal debts could not be

challenged under § 523(a)(2)(A), but would have to be in writing and challenged under

§ 523(a)(2)(B).

The Court also stated that it was applying the ordinary meaning to the term "respecting".

<u>Id.</u>  It stated:

> For our purposes, then, the key word in the statutory phrase is the
> preposition "respecting," which joins together "statement" and

18

> "financial condition".  As a matter of ordinary usage, "respecting"
> means "in view of: considering; with regard or relation to:
> regarding; concerning."

Id. at 1759. (citation omitted).  Therefore, any oral representation in the phone calls about

Debtor's or his company's intent to file bankruptcy or overall financial condition would be a

representation "respecting the debtor's or an insider's financial condition" that would have to be

in writing and challenged under § 523(a)(2)(B).  Accordingly, because all of Debtor's oral

representations on the phone calls were "respecting" the Debtor's or AgForest's financial

condition, they may not be challenged under § 523(a)(2)(A).

3.  Section 523(a)(4).

Kapitus argues that, pursuant to the two contracts, it purchased all of AgForest's

receivables.  It contends that Debtor embezzled Kapitus' receivables when he "misappropriated

the funds for his own benefit and with fraudulent intent."  (Doc. 25, Kapitus' Proposed Findings

of Fact and Conclusions of Law, p. 19).

Section 523(a)(4), in pertinent part, excepts from discharge any debt for embezzlement.

The Eleventh Circuit has stated that the term "embezzlement" is defined by federal common law

for purposes of § 523(a)(4).  Fernandez v. Havana Gardens, LLC, 562 Fed. Appx. 854, 856 (11th

Cir. 2014).  "Under federal common law, 'embezzlement' is 'the fraudulent appropriation of

property by a person to whom such property has been entrusted, or into whose hands it has

lawfully come.'  Id. (quoting United States v. Sayklay, 542 F.2d 942, 944 (5th Cir. 1976)).  To

prevail on a § 523(a)(4) claim for embezzlement, a creditor must prove that "(1) 'he entrusted

property to the debtor,' (2) 'the debtor appropriated the property for a use other than that for

which it was entrusted,' and (3) 'the circumstances indicate fraud.'" Kern v. Taylor (In re

Taylor), 551 B.R. 506, 521 (Bankr.M.D.Ala. 2016) (citation omitted).  See United States v. Reid

(In re Reid), 598 B.R. 674, 681 (Bankr.S.D.Ala. 2019); Jones v. Hall (In re Hall), 295 B.R. 877,

882 (Bankr.W.D.Ark. 2003).  Accordingly, for Kapitus to prevail on its § 523(a)(4) claim, it

must show that Debtor  appropriated Kapitus' property.  This, in turn, requires a determination of

whether the June and September Contracts were actually contracts of sale or disguised loans.

In the case of GMI Group, Inc. v. Unique Funding Solutions, LLC (In re GMI Group,

Inc.), 606 B.R. 467 (Bankr. N.D. Ga 2019), the court considered a financing agreement similar to

the one in the instant case to determine whether the creditor had violated New York's criminal

usury law.  The court first had to determine whether the transaction was an absolute sale, to

which usury would not apply, or a disguised loan transaction to which usury would apply.  The

court found that the New York courts look at a number of factors.  The court explained:

> When determining whether a transaction constitutes a usurious
> loan it must be considered in its totality and judged by its real
> character, rather than by the name, color, or form which the parties
> have seen fit to give it.  Whether a transaction constitutes a cover
> for usury is a question of fact.
>
> In order for a transaction to constitute a loan, there must be a
> borrower and a lender; and it must appear that the real purpose of
> the transaction was, on the one side, to lend money at usurious
> interest reserved in some form by the contract and, on the other
> side, to borrow upon the usurious terms dictated by the lender.

Id. at 483-84, (quoting Colonial Funding Network, Inc. v. Epazz, 252 F.Sup. 3d 274, 280-81

(S.D.N.Y. 2017)).

The court said the first factor is the existence of a reconciliation provision that allows for

an adjustment of the daily withdrawal amount based on the merchant's actual collection of future

receivables.  Id. at 484.  As in GMI, the agreements in this case have reconciliation provisions,

though not as detailed as in <u>GMI</u>.  This suggests an absolute sale.

The second factor the court considered under New York law was if the buyer had

recourse against the merchant in the event the merchant filed bankruptcy.  In <u>GMI</u>, bankruptcy

was not an event of default and in the event of bankruptcy, if the merchant was not otherwise in

default, the merchant would have no further liability.  <u>Id.</u> at 485.  This suggested an absolute sale.

With respect to the agreements in this case, bankruptcy is an event of default (Paragraph 3.1(c))

giving Kapitus the right to collect all amounts due under the agreement and to enforce its security

interest in the receivables.  (Paragraph 1.11).  This suggests that these agreements are in fact

loans.

The court in <u>GMI</u>, also looked at whether the agreement had a definite term.  <u>Id.</u>  As was

the case in <u>GMI</u>, Paragraph 1.2 of the contracts in this case have an indefinite term, suggesting an

actual sale.

However, the court in <u>GMI</u> concluded that, under New York law, the ultimate inquiry is

whether the agreement provides for a guaranteed repayment.  <u>Id.</u>  And, as in <u>GMI</u>, these

agreements do.  Any default allows Kapitus to demand full repayment of the amounts advanced

plus all fees, allows Kapitus to enforce Debtor's personal guaranty and enforce its security

interest in its collateral.  <u>See</u> Paragraphs 1.11, 3.1 and 3.2.  The court in <u>GMI</u> held that the

absolute repayment requirement overrode all other factors and held that the agreement was a

loan, not an absolute sale.  For the same reason, this Court finds that the agreements in this case

are, in fact, loans.

Accordingly, AgForest's receivables are not the property of Kapitus.  Kapitus' interest in

the receivables is limited to its security interest and, as recently held by this Court in

21

Fidelity Bank v. Jimenez (In re Jimenez), 608 B.R. 322 (Bankr. M.D.Ga. 2019), "a creditor's

security interest in property owned by the debtor is an insufficient ownership interest to support a

claim under § 523(a)(4)." Id. at 330.  In summary, because Debtor did not misappropriate

property owned by Kapitus, there is no embezzlement claim under § 523(a)(4).


4.  Section 523(a)(6).

       Finally, Kapitus contends that its claim is nondischargeable under § 523(a)(6), arguing

that Debtor:

> willfully injured Kapitus by deliberately and intentionally
> preventing Kapitus from obtaining the receipts it owned.  He
> intentionally stopped all ACH payments.  He diverted receivables
> to another bank account.  And he opened a new successor company
> to prevent Kapitus from finding out that AgForest was still in
> operation and was still producing receivables that belonged to
> Kapitus.  He then used the receivables for his own benefit.

Docket No. 25, Kapitus' Proposed Findings of Fact and Conclusions of Law, p. 21.

       Section 523(a)(6) excludes from discharge a debt "for willful and malicious injury by the

debtor to another entity or to the property of another entity".  As recently explained in the case of

Piedmont Bank v. Wisner (In re Wisner), 608 B.R. 589 (Bankr. N.D.Ga. 2019):

> The Supreme Court has held that § 523(a)(6) covers only "acts
> done with the actual intent to cause injury." Kawaauhau v. Geiger,
> 523 U.S. 57, 61, 118 S.Ct. 974, 140 L. Ed. 2d 90 (1998).  The
> Eleventh Circuit has "conclude[d] that a debtor is responsible for a
> 'willful' injury when he or she commits an intentional act the
> purpose of which is to cause injury or which is substantially certain
> to cause injury."  Hope v. Walker (In re Walker), 48 F.3d 1161,
> 1165 (11th Cir. 1995); accord In re Kane, 755 F.3d 1285, 1295
> (11th Cir. 2014) (quoting Maxfield v. Jennings (In re Jennings),
> 670 F.3d 1329, 1334 (11th Cir. 2012)).  "[A]lthough Geiger
> suggested a relationship between § 523(a)(6) and intentional torts,

> the Geiger standard is not necessarily satisfied by simply proving
> the elements of an intentional tort. 'Merely because a tort is
> classified as intentional does not mean that any injury caused by
> the tortfeasor is willful.'" Britt's Home Furnishing, Inc. v.
> Hollowell (In re Hollowell), 242 B.R. 541, 544 (Bankr. N.D.Ga.
> 1999) (quoting Miller v. J.D. Abrams, Inc., 156 F.3d 598, 604 (5th
> Cir. 1998)).  A creditor must also establish malice which requires
> Plaintiff to show that Defendant's actions were "'wrongful and
> without just cause or excessive even in the absence of personal
> hatred, spite or ill-will.'" In re Jennings, 670 F.3d at 1334 (quoting
> In re Walker, 48 F.3d at 1164 (quoting In re Ikner, 883 F.2d 986,
> 991 (11th Cir. 1989))).

Id. at 600.

First, as explained above, Kapitus did not "own" the receivables.  It merely had a security

interest in the receivables.  As for stopping the ACH payments, Debtor testified that he did this

after AgForest lost a major contract and could no longer pay the required payments.  (Tr. 153-

54).  There was no evidence that he stopped the payments for the purpose of causing injury to

Kapitus.

The evidence was that the new company was opened after AgForest failed and Debtor

filed bankruptcy.  (Tr. 153-54, Exhibit 30).  There was no evidence that he did this to hide

anything from Kapitus.

As for diverting receivables to another bank account, the testimony was that when Debtor

began receiving money on a particular contract, he no longer had a bank account into which he

could deposit checks.  Accordingly, he opened a new account to handle those funds.  (Tr. 157-

60).  There was no evidence that he opened the account to divert receivables.

Finally, as for using the receivables for his own personal benefit, as explained above,

some of the payments for Debtor's personal expenses and the expenses of his assistant were in

23

lieu of salary.  Further, because the payments came from a co-mingled account, the payments

cannot be traced to Kapitus' collateral.  Finally, there was no evidence that the payment of

personal expenses was done for the purpose of harming Kapitus.

A final response to Kapitus' § 523(a)(6) claim is that the debt which Kapitus sought to

have declared nondischargeable did not arise from an injury by Debtor to Kapitus' property.

Rather, this debt was created when the two contracts were signed and Kapitus advanced funds

pursuant thereto for which AgForest and Debtor became obligated to repay.  Thus, Kapitus has

no claim under § 523(a)(6).


<u>CONCLUSION</u>

In conclusion, Kapitus has failed to carry its burden of proof that its claim is

nondischargeable under any provision of § 523.  Accordingly, on Kapitus' complaint to

determine nondischargeability of debt, the Court finds in favor of Debtor and against Kapitus.

Judgment consistent with this opinion shall be entered separately.

*END OF DOCUMENT*